FOSTER vs. MOTT.

*In the matter of the Guardianship of SARAH ANN FOSTER.*

THE father of a minor having failed to exercise his right of appointing a guardian by deed or will, the court, upon which it devolves to determine the guardianship, will pronounce upon the question, in accordance with what appears to be for the best interests of the infant, taking into view not merely his or her temporary welfare, but the state of the affections, attachments, training, education, and morals.

Though great respect should be paid to the wishes of the deceased parents, even where they have not been expressed in a definite or legal form, still it is the duty of the court to see whether the conclusions of the parents are well founded, and such as command approval. If there is no reasonable objection to the gratification of their wishes, they will be controlling.

Where the father of an infant promised the mother on her death-bed, that the child should remain under the charge of her grand-parents, with whom she had been living since her birth, and the grand-parents had retained the custody under this engagement for seven years, notwithstanding the father, who had married again, expressed a desire to have his brother appointed the guardian, it was *held* that the father being dead, letters should issue to the grandfather, no good reason being shown for disturbing the arrangement originally made by the father at the decease of the child's mother.

CHAUNCEY SCHAFFER, *for Applicant.*

CHARLES S. SPENCER, *for Contestants.*

THE SURROGATE.—Alfred W. Foster, of Sag Harbor, Suffolk county, the paternal uncle of the minor, applies for letters of guardianship, and the application is resisted by the maternal grandmother of the child, who resides in this city. The minor is a girl about ten years old, and possessed of no property, except a few hundred dollars in the savings-bank. Her mother died some seven years ago; after the decease of his wife, the father remained single until September, 1853, when he married again. He died on the fifteenth of the pre-

sent month. I understand both of the parents to have resided with the grand-parents until Mrs. Foster's decease, and that Mr. Foster, who was a sea-faring man, continued his residence with them, when on shore, until the time of his second marriage, when he removed to another abode. There is very clear and uncontradicted evidence that the child's mother on her death-bed, about an hour before she died, obtained from her husband a promise that Sarah should always remain with her grandmother. One witness says "the mother asked her husband whether he would not give the child to the grandmother, always to live with her. He said he would." Another witness says, "I was well acquainted with the mother of the child before her death. I was present at her death. Mr. Foster, the father, was also present. The grandfather had the child in his arms. The father stood next. The mother asked the father if he would give the child to the grandparents. She first asked the grandfather if he would take the child and be a father to it, as he was to her. He answered yes. She then said, 'William, I am dying; will you give the child to her grand-parents, and never take her from them. She emphasized the word 'never.' He answered, 'Yes, Lucretia, I will.' She then asked him, if he would help take care of it, and do all he could towards supporting it? He answered, he would. She died about an hour afterwards." Another witness states that the child was very sick at the time of the decease of her mother, that the mother on being told by the physician she herself could not live, "said she would like to see her husband; he went by her bedside, and she told him she was dying, that she did not wish him to remain single, but that she did not wish any stepmother over her child. The mother on the next day asked her husband whether he would give the child to the grand-parents, he said yes."

The infant thus solemnly confided to the care of her grandparents, has remained in their charge to the present time, been sent to school, and provided for in every respect at their own expense, except clothing contributed by the father

from time to time. The effort now made to effect a change in her custody and management, grows out of the declarations of the father before his decease, that Sarah was humored and spoiled by her grand-parents, and had acquired the bad habit of telling untruths and using improper language, —that he wished his brother, the applicant, to become guardian, and called upon his counsel for the purpose of having the proper legal measures taken, but was prevented from then completing his design in consequence of the engagements of his professional adviser—that the father, during his last illness, expressed the desire that after his death the girl should be placed in charge of her uncle. There is no doubt whatever that the father entertained these views, but I perceive no indication of a desire to change the custody of his daughter, until after his second marriage. Before that, there are several persons testifying that he expressed his satisfaction as to her treatment, and only two who undertake to say that he was dissatisfied. They say he complained the child was allowed to use profane language ; one of them testifies he " told me, three years ago last summer, that the child would curse and swear." Whatever may have been the father's views before his second marriage, they do not appear to have resulted in any determination hostile to the wishes of the grand-parents. After his marriage, however, they assume a more definite form, though never carried out into positive action. One of the occasions of improper conduct occurred in reference to the child's stepmother, and at another time the father spoke of the girl's " false stories" as creating " a disturbance," and Mrs. Foulkes states that he told her in July last he meant to have the child, and "would take her away in spite of them." It is to be observed thus far that we have only the declarations of the father, without any means of ascertaining his sources of information. There is distinct proof of the child's using improper language twice—once when she had been quarrelling with her stepmother's sister, and again when sent for to see her sick father. It is also urged against her that she showed little feeling at her father's deathbed, and wished to

go home to her grandmother.   On the other hand, one of the teachers of  the  public  school  declares that for two years whilst Sarah has been under her tuition, she has behaved with propriety and decorum, and has repeatedly been rewarded for her fidelity and good conduct.   There are others who testify to the correctness of her deportment, and the grand-parents are also placed before me on abundant testimony as having a good character for morals, honesty, and sobriety, in the community.

Such are the leading facts in this case.   The law is simply this : the father having failed to exercise his right of appointing a guardian by deed or will, the court, upon which it devolves to determine the guardianship, will pronounce upon that question in accordance with what appears to be for the best interests of  the  minor, taking into view not merely her temporary welfare, but the state of her affections, attachments, her training, education, and morals.   Great respect, however, is to be paid to the wishes of the deceased parents, even where they have not been expressed in a definite or legal form, but still, after giving them every proper consideration, as a proper element to influence the mind of the judge, we come back to the question of what is best for the welfare of the child.   On subjects wherein mankind differ, and there is fair ground for difference, the views of the parents will have the greatest weight, and in some instances be controlling; while upon other points it is the duty of the court to examine into the conclusions of  the parent, and see whether they were well founded and such as command approval.   A mere whim or caprice, or hostile feeling against particular relatives, would not justify a blind adherence to the father's views.   A determination to place the custody of the child where it would be subject to demoralizing influences would have no other effect on the mind of the court than to lead to criticism on such a conclusion, and a refusal to be guided by it.   But if there be no fair and reasonable objection to the gratification of the wishes of the parents, then the court acting for the benefit of the minor, and finding no ground for

disregarding the parents' views, will rather hasten to be guided by them, than to thwart them. Now, as I have already observed, the father of the infant expressed no determination to change the custody of the child, until after his second marriage, and it is obvious the reason of changing his mind then, did not relate to new advantages acquired for taking care of her on his remarriage, for he did not propose to bring her into his own house, but to send her to her uncle in the country. It is probable, also, that his own means of judging of his daughter's deportment were not so favorable after his marriage, as before, when he was domesticated in the family of the grand-parents, when not following his calling.

Again; looking at the vices which the father made the subject of complaint, it by no means follows that they were the result of bad training on the part of those in whose charge she was. The best of parents often have to lament the waywardness of a disobedient child, despite every possible means employed to guide it in the path of virtue. The experience of life shows that it is a harsh judgment to lay the bad habits of the offspring invariably to the charge of the parents. Education and moral culture accomplish much, but they are not omnipotent. And even where defects are observed in parental training, it does not always follow that strangers influenced by more correct and rigid notions would succeed better. There are advantages flowing out of the parental relation such as do not exist under other circumstances,—there are motives of affection, gratitude, and duty existing, that form a strong ground for appealing to the moral nature of the young. It is unwise to throw away this class of influences, unless they appear very clearly to be exercised in a manner detrimental to the child. Now it is quite apparent that the grand-parents stand *in loco parentis*. So I take it, from the history placed before me. This grandmother is quite as Sarah's mother. Living together as they have been since the girl's birth,—the child, nurtured by her grandmother alone from the tender age of three years, placed in her grandmother's arms, at the request, and almost with the departing

breath of her dying mother, and the solemn promise of the father,—the two are bound together by every tie of habit and love, as parent and child. It must require very strong and urgent considerations to disturb this connection, violate the vow by which it was initiated, and tear away the child to place her under another tutelage. In view of the good character of the grand-parents and the evidence in favor of the general good character of the child, it would, I think, be alike cruel and unwise to separate them, unless upon much stronger evidence of bad conduct on her part, and of neglect on theirs, than has been placed before me. The effect of placing her under the control of a stranger, though a near relation by blood, with a sense of injury and injustice in being deprived of the companionship of her grandmother, would naturally be such as largely to mar her happiness and seriously impede the growth of such an influence over her by the proposed guardian, as the successful management of a child of her age generally requires. The evidence before me is not sufficient to justify such a course. The application is denied, the respective parties paying their own costs.